## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| **WHITESELL-GREEN, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. _____** |
| | ) | |
| **DEVELOPERS SURETY AND** | ) | |
| **INDEMNITY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

**COMES NOW**, Plaintiff Whitesell-Green, Inc. ("WGI"), by and through its undersigned counsel of record, and hereby sues Defendant Developers Surety and Indemnity Company ("Developers") and alleges the following:

## PARTIES, JURISDICTION, AND VENUE

1.      WGI is a Florida corporation organized and existing under the laws of the State of Florida, with its principal place of business being located at 3881 North Palafox Street, Pensacola, Florida 32505.  WGI has 4 members who are all citizens of Florida:

      (a)      William K. Whitesell, II;

      (b)      William K. Whitesell, III;

      (c)      Jill Whitesell; and

1

(d)     Elizabeth W. Locklear.

2.     Based on information and belief, Developers is a company organized and existing under the laws of the State of California with its principal place of business being located in Irvine, California.   Developers can be served with process by serving its Florida Registered Agent, Chief Financial Officer, 200 E. Gaines Street, Tallahassee, Florida 32399.

3.     This Court has subject matter jurisdiction over this lawsuit under 28 U.S.C.A. § 1332(a)(1) because WGI and Developers are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4.     This Court has personal jurisdiction over Developers as Developers transacts business in Escambia County, Florida issuing Performance Bonds, as Surety, to its Principal, Sheet Metal Masters, Inc. ("SMM"), naming WGI as the Obligee covering a project located in Escambia County, Florida which is the subject matter of this action.   The exercise of jurisdiction over the parties will not violate due process because WGI's causes of action grow out of Developers' purposeful contact with Florida by issuing Performance Bonds covering a project located in Escambia County, Florida whereby Developers should have reasonably anticipated defending suit in this Court.

5.     Venue is proper in this District under 28 U.S.C.A. § 1391(b)(2) as a substantial part of the events or omissions giving rise to WGI's claims against Developers occurred in this District with the project that is the subject of this action being situated in Escambia County, Florida.

## FACTUAL BACKGROUND

## THE PROJECT

6.     WGI is a general contractor working primarily on commercial construction projects.

7.     In 2015, WGI entered into a prime contract with the Department of the Navy (the "Navy") to serve as the general contractor for an extensive renovation of the Bachelor's Quarters Naval Station Barracks Buildings 3709 and 3710 (also known as Corry "A" Station), located in Pensacola, Escambia County, Florida (the "Project").

8.     Buildings 3709 and 3710 (and the other buildings comprising the Bachelor's Quarters/Corry "A" Station complex) had previously been renovated in the 1960's and then again in the 1980's before the undertaking of the renovation work which is the subject matter of this dispute.

9.     The Project was a Design-Bid-Build concept with the renovation work to progress in phases with each phase to be performed and completed in both buildings before the next phase was to be begin.

## THE SUBCONTRACTS AND PERFORMANCE BONDS

10.    On January 13, 2015, WGI entered into a Subcontract Agreement ("Steel Erection Subcontract") with SMM for SMM's scope of work to include providing: "all supervision, labor, materials, equipment, tools, insurance, permits, licenses, taxes, transportation, drayage, hoisting, all other aspects of materials handling, engineering, layout, safety control and regulation compliance to achieve a complete, functioning and workmanlike installation of: **STEEL ERECTION**" ("Steel Erection Work") for the Project (No. N69450-15-C-0601).   A true and correct copy of SMM's Steel Erection Subcontract is attached hereto and is incorporated herein by reference as **Exhibit 1**.

11.    SMM, in compliance with the Steel Erection Subcontract, secured *Subcontract Performance Bond Form A* (Bond No. 48118P) covering its <u>Steel Erection</u> for the Project (#N69450-15-C-0601 Job #1501) with the bond being issued by Developers (Surety), naming SMM as the Principal, and WGI as the Obligee in the amount of $204,000.00 (the "Steel Erection Bond").   A true and correct copy of the Steel Erection Bond (and a copy of the related *Subcontract Labor and Material Payment Bond* for reference) is attached hereto and is incorporated herein by reference as **Exhibit 2**.

12.    On January 13, 2015, WGI also entered into a Subcontract Agreement with SMM for SMM to provide "all supervision, labor, materials, equipment, tools,

insurance, permits, licenses, taxes, transportation, drayage, hoisting, all other aspects of materials handling, engineering, layout, safety control and regulation compliance to achieve a complete, functioning and workmanlike installation of: **STANDING SEAM METAL ROOF & LIGHT GUAGE METAL TRUSSES** ("Metal Roofing Work") for the same Project (N69450-15-C-0601) ("Metal Roof Subcontract"). A true and correct copy of SMM's Metal Roof Subcontract is attached hereto and is incorporated herein by reference as **Exhibit 3.**

13. SMM, in compliance with the Metal Roof Subcontract, secured *Subcontract Performance Bond Form A* (Bond No. 481117P) covering its Standing Seam Metal Roof for the Project (#N69450-15-C-0601 Job #1501) with the bond being issued by Developers (Surety), naming SMM as the Principal, and WGI as the Obligee in the amount of $362,100.00 (the "Metal Roof Bond"). A true and correct copy of the Metal Roof Bond (and a copy of the related *Subcontract Labor and Material Payment Bond* for reference) is attached hereto and is incorporated herein by reference as **Exhibit 4**.

14. During construction, SMM (and other subcontractors and suppliers) caused substantial damage to the Project with SMM's actions and/or omissions also causing damage to adjacent non-defective work performed by other trades already in place.

15.    SMM's Metal Roof Work was partially defective and deficient being performed in a negligent manner and was not in conformity with the Metal Roof Subcontract and relevant Project documents causing delays.

16.    WGI's renovation work for both buildings was anticipated to have been completed by **May 17, 2017**, but substantial completion was not achieved until **November 18, 2019** (constituting a 30-month delay) with the Navy not finally accepting and "closing-out" the Project until **July 27, 2020**, due in large part to the acts and omissions of SMM regarding both its Steel Erection and Metal Roofing Work.

## THE DISCOVERY OF SMM'S DEFECTIVE AND DEFICIENT WORK

17.    A portion of SMM's acts and omissions constituting defective and deficient work were discovered on November 21, 2016.

18.    At the time of discovery, WGI was on track to have both Buildings 3709 and 3710 completed on or before May 17, 2017.  In fact, as of November 21, 2016:

- Both buildings were determined ready for overhead inspection by the Navy;

- All the walls were drywalled, fire caulked, and ready to be painted;

- The ceiling framing was virtually complete;

- Drywall was stocked in rooms to be hung on the ceilings;

- The tile flooring was being installed;

- The cabinets and casework were beginning to be delivered to the Project;

- The doors, AC units, and fixtures were beginning to be delivered;

- The stucco exterior on Building 3709 was nearing completion;

- The Project had been approved with progress payments being made to 85% completion; and

- The Navy and WGI were satisfied with the overall progress and the anticipated completion date of May 17, 2017, for the Project.

19.    After discovering the acts and omissions of SMM (and other subcontractors and suppliers), the Navy immediately demanded that WGI and/or WGI's subcontractors address the identified acts or omissions and repair all resulting damage to the Project.

20.    In order to facilitate the repairs and remediation which needed to be provided for the Project, WGI and the Navy agreed to a Recovery and Repair Protocol which was created and initiated toward the end of 2017 and continued to be used through the completion of the Project.

## SMM'S ACTS AND OMISSIONS

## STEEL ERECTION WORK

21.    SMM was contractually obligated to provide the Steel Erection Work for the Project.

22.    SMM's Steel Erection Work was to be complete, functioning, and provided in a good and workmanlike manner in strict accordance with **all** plans, specifications, and addenda.

23.    On December 17, 2015, SMM began its Steel Erection Work for the Project.  Unfortunately, the Steel Erection Work that SMM provided for the Project did not comply with the terms of the Steel Erection Subcontract but instead was performed in a negligent manner.

24.    SMM's Steel Erection Work suffers from both quality and timeliness deficiencies which caused extensive and systemic damage to the Project.

25.    As a result of SMM's acts and omissions, the Navy sent WGI Notices of Deficiencies on December 2, 2016, and again on January 26, 2017.

26.    To no avail, WGI sent SMM numerous notices regarding the problems with its Steel Erection Work requesting that it be corrected.

27.    SMM's acts and omissions and the resulting damage necessitated emergency shoring to secure the buildings.

28.    SMM's defective Steel Erection Work and SMM's subsequent failed remediation efforts also caused significant direct damage to adjacent non-defective

work of other trades (all of which required WGI to perform extensive "rip and tear" work to address).

29.     SMM's defective and deficient Steel Erection Work provided for the **ATFP Progressive Collapse** includes, *inter alia*: (a) items were not properly welded with quantity and quality issues existing throughout; (b) items were not continuous; (c) Plate Tab Anchors were too shallow with no epoxy being applied in some cases; (d) there were over 1,200 insufficient butt splices and over 2,000 insufficient intersection welds which required WGI to have to install 3 miles of repair weld to correct these issues; (e) SMM installed 48 insufficient corner peripheral connections; and (f) SMM did not comply with Structural Sheet ("S") S-501, Details A – E of the Project plans and specifications in relationship to this scope of work.

30.     SMM's defective and deficient Steel Erection Work provided for the Project includes, *inter alia*: (a) there were issues with existing floor joists cut by SMM resulting in approximately 36 floor joints having to be repaired; (b) there were missing H, J and K clips, that were not installed; (c) SMM did not comply with Structural Sheets S-304, S-305, and S-501, Details H, J & K of the Project plans and specifications in relationship to this scope of work; (d) there were problems with missing steel tube door frames; and (e) there was no "furring" on several key braced frame walls.

31.    SMM's defective and deficient Steel Erection Work provided for the **Braced Frame Elements** includes, *inter alia*: (a) there were problems with the "Braced Frame Elements" which include the End Post Studs; Hold Downs; Hold Down Anchors; Strap Plates/Braces; and Powder Actuated Fasteners ("PAF's"); (b) there were numerous walls in many areas where brace frame elements were missing; and (c) SMM did not comply with S-401 and S-402 of the Project plans and specifications in relationship to this scope of work.

32.    SMM's defective and deficient Steel Erection Work provided for the **Hold Downs (Braced Frame Elements)** includes, *inter alia*: (a) SMM did not fully weld hold downs onto the end posts; (b) SMM only welded about 100 linear feet of hold downs, which were woefully incomplete; and (c) as a result, WGI had to weld about 2,000 linear feet of hold downs to complete this scope of work.

33.    SMM's defective and deficient Steel Erection Work provided for the **Hold Down Anchors (Braced Frame Elements)** includes, *inter alia*: (a) the ground floor anchors did not reach the footing as shown on the plans and specifications (e.g. the embedment depth was insufficient and the anchors were not epoxied); (b) the ground floor anchors were only 6 to 8 inches long but should have been 20 to 24 inches; (c) SMM did not comply with S-401, Details 1, 2 and 3 of the plans and specifications in performing this scope of work resulting in WGI having to remove the defective hold downs and properly installing over 150 hold

down anchors; (d) the anchor bolts for holds on floors 2 and 3 did not go through the upper floor slabs as required; (e) there were "fake anchor bolts" installed with no effort to properly protrude through floors 2 and 3, and which is some cases did not even line-up between floors; and (f) SMM did not comply with S-402, Detail B of the Project plans and specifications when performing this scope of work.

34.     SMM's defective and deficient Steel Erection Work provided for the **Strap Plates/Braces (Braced Frame Elements)** includes, *inter alia*: (a) the strap plates/braces were the wrong size; (b) the strap plates/braces were missing and/or were not installed; (c) the strap plates/braces were insufficiently welded or missing screws; and (d) as a result, WGI was required to provide over 1,500 linear feet of weld and thousands of screws to correct the issues with the improperly installed strap plates/braces.

35.     SMM's defective and deficient Steel Erection Work provided for the **Powder Actuated Fasteners (Braced Frame Elements)** includes, *inter alia*: (a) the PAF's were not installed in the structural steel tracks to the slab/deck; (b) SMM only had a handful of PAF's installed in the tracks but should have had many; (c) there were more than 12,000 missing PAF's, which WGI had to install; and (d) SMM failed to comply with S-402 of the Project plans and specifications regarding this scope of work.

36.    In August of 2019, the Navy demanded that every single fire alarm device be removed and replaced in both Buildings 3709 and 3710.  The reason being, is that the fire alarm devices had been stored in Conex Boxes for over 2.5 years (while WGI performed repair and remediation of SMM's Steel Erection Work as well as other deficiencies) with the Navy being concerned that these devices had been exposed to extremes in temperature and would not function properly creating a life and safety issue.

## DAMAGE TO THE EXISTING STRUCTURES AND TO NON-DEFECTIVE ADJACENT WORK

37.    SMM's defective and negligent Steel Structural Work and subsequent failed repair attempts caused direct damage to the existing structure such as existing floor joists and to adjacent non-defective work performed by other trades.

38.    SMM, in performing its failed repair attempts to its Steel Structural Work, added coupons and straps to the **ATFP Progressive Collapse** structure on all three floors of both buildings, which in the process resulted in molten weld "spatter" landing on and damaging, *inter alia*: (a) electrical wiring and conduit; (b) fire suppression system elements; (c) mechanical (HVAC) insulation; and (d) fire alarm system and wiring.

39.    SMM also caused damage to the following categories of adjacent non-defective work which includes, but is not limited to: (1) steel work; (2) framing;

(3) drywall; (4) insulation; (5) stucco; (6) air barriers; (7) ceiling grids; (8) electrical work; (9) fire suppression – CPVC; (10) duct work; (11) duct insulation; (12) plumbing pipe; (13) plumbing insulation; (14) doors; (15) door frames; (16) window frames; (17) storefronts; (18) cabinets; (19) cabinet bases; (20) shower pans; (21) tile; and (22) carpeting.

40.     SMM also cut into the existing overhead structure when performing **ATFP Progressive Collapse** work and subsequent repair activities damaging the work of the previous trades.

41.     WGI was required by the Navy to replace and/or remediate the damage that SMM caused to adjacent non-defective work performed by other trades throughout both buildings with WGI removing approximately 350+ tons (or 700,000+ pounds) of materials from both buildings in the process.

<u>**SMM'S SUBCONTRACT BREACHES**</u>

<u>**STEEL ERECTION WORK**</u>

42.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

**ARTICLE 2 SCOPE OF WORK**

**2.2    SUBCONTRACT WORK** . . . Subcontractor shall perform the Subcontract Work under the general direction of Contractor and in

accordance with the Subcontract Documents (**Exhibit 1**, attached hereto).

43.     SMM failed to comply with 2.2 of the Steel Erection Subcontract by not performing its Steel Erection Work according to various provisions (e.g. S-304; S-305; S-401, including Details 1, 2 and 3; S-402, including Detail B; S-501, including Details A – E, H, J and K) of the Project's plans and specification by providing defective and deficient Steel Erection Work, including defective repair work as outlined above.

44.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

### ARTICLE 3 SUBCONTRACTOR'S RESPONSIBILITIES

**3.2     RESPONSIBILITIES** Subcontractor shall furnish its diligent efforts to perform the Subcontract Work in an expeditious manner and to cooperate with Contractor so that Contractor may fulfill its obligations to Owner.  Subcontractor shall furnish all of the labor, materials, equipment, and services, including, but not limited to, competent supervision, shop drawings, samples, tools, and scaffolding as are necessary for the proper performance of the Subcontract Work, all of which shall be provided in full accord with and reasonably inferable from the Subcontract Documents.  Subcontractor shall provide Contractor a list of its proposed subcontractors and suppliers, and be responsible for taking field dimensions, providing tests, obtaining required permits related to the Subcontract Work and affidavits, ordering of materials and all other actions as required to meet the Progress Schedule (**Exhibit 1**, attached hereto).

45.    SMM breached 3.2 of the Steel Erection Subcontract by failing to supervise, perform, and install its Steel Erection Work in a proper fashion causing massive delays whereby SMM's work was not performed in an expeditious manner.  The Project was on track to be completed on or before May 17, 2017, but as a result of the defects and deficiencies (and the impact to the existing structure and to non-defective adjacent work) caused a 30-month delay with the Project not achieving substantial completion until **November 18, 2019** with the Navy's final acceptance and "close-out" not occurring until **July 27, 2020**.

46.    SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.3 INCONSISTENCIES AND OMISSIONS** Subcontractor shall examine and compare the drawings, specifications, other Subcontract Documents and information furnished by Owner relative to the Subcontract Work . . . Should Subcontractor discover any errors, inconsistencies, or omissions in the Subcontract Documents, Subcontractor shall promptly report such discoveries to Contractor in writing (**Exhibit 1**, attached hereto).

47.    SMM breached 3.3 of the Steel Erection Subcontract by failing to bring to WGI's attention any issues or discrepancies in the Project plans and specifications to the extent that SMM contends that the drawings or details as applied impacted its scope of work.

48.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.10  COORDINATION** Subcontractor shall (a) cooperate with Contractor and all others whose work may interface with the Subcontract Work; (b) specifically note and immediately advise Contractor of any such interface with the Subcontract Work (**Exhibit 1**, attached hereto).

49.     SMM breached 3.10 of the Steel Erection Subcontract by allowing its defective and deficient Steel Erection Work to damage and ultimately delay adjacent non-defective work performed by other trades.  SMM also did not provide WGI with notice of SMM's impact on adjacent non-defective work.

50.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.13  GENERAL   WARRANTIES   ON   MATERIALS   AND EQUIPMENT** In addition to the warranties set forth in the Subcontract Documents, Subcontractor warrants that all materials and equipment shall be new unless otherwise specified, of good quality, in conformance with the Subcontract Documents, and free from defective workmanship and materials. . . Subcontractor further warrants that the Subcontract Work shall be free from material defects not intrinsic in the design or materials required in the Subcontract Documents (**Exhibit 1**, attached hereto).

51.     SMM breached 3.13 of the Steel Erection Subcontract by failing to provide materials for the Project which were new, of good quality, in conformance with the plans and specifications, and free from defects with SMM's materials being substandard and needing to be removed and replaced.

52.     SMM also breached 3.13 of the Steel Erection Subcontract as SMM's materials were defective in that: (1) elements installed for the ATFP Progressive Collapse were not the proper quality; (2) the Plate Tab Anchors were too shallow; (3) the ground floor hold down anchors did not reach the footing being too short (e.g. the embedment depth was insufficient with the anchors only being 6 – 8 inches long instead of 20 – 24 inches as called for by the plans and specifications); (4) SMM inexplicitly installed numerous "fake" anchor bolts; (5) SMM installed anchor bolts that did not go through the upper floors; (6) SMM installed anchor bolts that in some cases did not line-up between floors; and (7) the strap plates/braces were the wrong size or incomplete.  These defects were contrary to the requirements as provided for by S-501, Details A – E; S-401, Details 1, 2 and 3; S-402, Detail B.

53.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

### 3.15 SAFETY

**3.15.5** . . . Subcontractor shall use properly qualified individuals or entities to carry out the Subcontract Work in a safe and reasonable manner so as to reduce the risk of bodily injury or ***property damage*** (Emphasis added; **Exhibit 1**, attached hereto).

54.     SMM breached 3.15.5 of the Steel Erection Subcontract by using individuals whom were not qualified to perform the work pursuant to the Steel Erection Subcontract documents resulting in substantial property damage not only to SMM's work, but also to the existing buildings and to adjacent non-defective work performed by other trades.

55.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

**3.15.6** Damage or loss not insured under property insurance and to the extent caused by the negligent acts or omissions of Subcontractor, or anyone for whose acts Subcontractor may be liable, shall be promptly remedied by Subcontractor (**Exhibit 1**, attached hereto).

56.     SMM, despite being placed on notice on numerous occasions by WGI (as described above), failed to remedy its negligent work which resulted in damage and loss to both SMM's work and to adjacent non-defective work performed by other trades.

57.    SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.16 PROTECTION OF THE WORK** Subcontractor shall take necessary precautions to properly protect the Subcontract Work and the work of others from damage caused by Subcontractor's performance of the Subcontract Work.  Should Subcontractor cause damage to the Work or property of Owner, Contractor, or others, Subcontractor shall promptly remedy such damage to the satisfaction of Contractor, or Contractor may, after forty-eight (48) hours' written notice to Subcontractor, remedy the damage and deduct its cost from any amounts due or to become due to Subcontractor, unless such costs are recovered under applicable property insurance (**Exhibit 1**, attached hereto).

58.    SMM breached 3.16 of the Structural Steel Subcontract by failing to protect the adjacent non-defective work performed by other trades when SMM attempted to repair its own substandard work.  SMM, after damaging its own work, the existing structure, and the non-defective work performed by other trades, also failed to promptly remedy such damage to the satisfaction of the Navy and WGI after receiving written notice of the various issues.

59.    SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

### 3.23.1 UNCOVERING OF SUBCONTRACT WORK

**3.23.1.1** If required in writing by Contractor, Subcontractor must uncover any portion of the Subcontract Work which has been covered by Subcontractor in violation of the Subcontract Documents or contrary to a directive issued to Subcontract by Contractor. Upon receipt of a written directive from Contractor, Subcontractor shall uncover such work for Contractor's or Owner's inspection and restore the uncovered Subcontract Work to its original condition at Subcontractor's time and expense (**Exhibit 1**, attached hereto).

60.   SMM breached 3.23.1.1 of the Steel Erection Subcontract by failing to uncover its defective work as directed by WGI in writing. SMM further breached 3.23.1.1 by failing to restore its uncovered work to its original condition at SMM's time and expense.

61.   SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

### 3.23.1 UNCOVERING OF SUBCONTRACT WORK

**3.23.1.2** Contractor may direct Subcontractor to uncover portions of the Subcontract Work for inspection by Owner or Contractor at any time. Subcontractor is required to uncover such work whether or not Contractor or Owner had requested to inspect the Subcontract Work prior to it being covered. Except as provided in the subsection immediately above, this Agreement shall be adjusted by Subcontract Change Order for the cost and time of uncovering and restoring any work which is uncovered for inspection and proves to be installed in accordance with the Subcontract Documents, provided Contractor had not previously instructed Subcontractor to leave the work uncovered. If Subcontractor uncovers work pursuant to a directive issued by

Contractor, and such work upon inspection does not comply with the Subcontract Documents, Subcontractor shall be responsible for all costs and time of uncovering, correcting, and restoring the work so as to make it conform to the Subcontract Documents. . . (**Exhibit 1**, attached hereto).

62.     SMM breached 3.23.1.2 of the Steel Erection Subcontract by failing to take responsibility for all costs and time of uncovering, correcting, and restoring the defective work to make it conform with the plans and specifications.

63.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

### 3.23.2 CORRECTION OF WORK

**3.23.2.1** If Owner or Contractor rejects the Subcontract Work or the Subcontract Work is not in conformance with the Subcontract Documents, Subcontractor shall promptly correct the Subcontract Work whether it had been fabricated, installed or completed. Subcontractor shall be responsible for the costs of correcting such Subcontract Work, any required additional testing or inspections, and compensation for services and expenses of Owner and Contractor made necessary by the defective Subcontractor Work (**Exhibit 1**, attached hereto).

64.     SMM breached 3.23.2.1 of the Steel Erection Subcontract by failing to correct its work which the Navy and WGI deemed to not be in conformance with the Steel Erection Subcontract documents or to pay the costs of correcting and testing its defective work.

65.    SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.23.2.2** In addition to Subcontractor's obligations under this section, Subcontractor agrees to promptly correct, after receipt of a written notice from Contractor, all Subcontract Work performed under this Agreement which proves to be defective in workmanship or materials within a period of one year from the date of Substantial Completion of the Subcontract Work or for a longer period of time as may be required by specific warranties in the Subcontract Documents . . . If Subcontractor fails to correct defective or nonconforming Subcontract Work within a reasonable time after receipt of notice from Contractor, Contractor may correct such Subcontract Work pursuant to subsection 10.1.1. (**Exhibit 1**, attached hereto).

66.    SMM breached 3.23.2.2 by failing to promptly (or at all) correct its defective work and/or replace substandard materials after receiving written notice from WGI regarding the same.

67.    SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.23.4** If Subcontractor's correction or removal of Subcontract Work destroys or damages completed or partially completed work of Owner, Contractor or any separate contractors or subcontractors, Subcontractor shall be responsible for the reasonable cost of correcting such destroyed or damaged property (**Exhibit 1**, attached hereto).

68.     SMM breached 3.23.4 of the Steel Erection Subcontract by failing to pay the reasonable costs of correcting the damage caused to the existing structure and to adjacent non-defective work performed by other trades caused by SMM in attempting to correct its own substandard work.

69.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

> **3.23.5** If portions of Subcontract Work which do not conform with the requirements of the Subcontract Documents are neither corrected by Subcontractor nor accepted by Contractor, Subcontractor shall remove such Subcontract Work from the Worksite if so directed by Contractor (**Exhibit 1**, attached hereto).

70.     SMM breached 3.23.5 of the Steel Erection Subcontract by failing to remove its defective work and materials from the Project which were never corrected by SMM after being directed to do so by WGI.

71.     SMM, by providing defective and deficient Steel Erection Work (which also damaged the existing structure and adjacent non-defective work performed by other trades), breached its Steel Erection Subcontract, including, but not limited to, the following:

**ARTICLE 5 PROGRESS SCHEDULE**

**5.1 TIME IS OF THE ESSENCE** Time is of the essence for both Parties. They mutually agree to see to the performance of their respective obligations so that the entire Project may be completed in accordance with the Subcontract Documents and particularly the Progress Schedule as set forth in Exhibit C. (**Exhibit 1**, attached hereto).

72.     SMM breached 5.1 of the Steel Erection Subcontract as a result of its defective Steel Erection Work delaying the completion of the Project by 30 months with work still being performed by WGI to address the various issues.

## SMM'S ACTS AND OMISSIONS

## METAL ROOF WORK

73.     SMM was contractually obligated to provide the Metal Roof Work for the Project.

74.     SMM's Metal Roof Work was to be timely completed, functioning, and provided in a good and workmanlike manner in strict accordance with **all** shop drawings, plans and specifications, Subcontract Documents, Project contracts and/or addenda.

75.     The Metal Roof Work that SMM provided for the Project did not comply with the terms of the Metal Roof Subcontract but instead was performed in a negligent manner.

76.     SMM's Metal Roof Work suffers from both quality and timeliness deficiencies.

77.     The defects and deficiencies with SMM's Metal Roof Work, included but are not limited to: (a) the connections from the trusses to the existing roof system were inadequate (e.g. the screw pattern indicated in the shop drawings were not followed); (b) the connection brackets were not shop primed as required by specifications and required removal and replacement after priming; and (c) SMM failed to otherwise comply with the Project documents and requirements in performing its Metal Roof Work.

78.     SMM's defective and deficient Metal Roof Work contributed to the delays, with the Project to be completed by **May 17, 2015** with substantial completion, however, not being achieved until **November 18, 2019** (constituting a 30-month delay) with the Navy not finally accepting and "closing-out" the Project until **July 27, 2020** due in large part to the acts and omissions of SMM regarding its Metal Roof Work (in addition to the delays caused by its Steel Erection Work).

79.     During the time that SMM was on the Project, SMM was addressing and/or attempting to remedy both its defective and deficient Steel Erection and Metal Roof Work.

## SMM'S SUBCONTRACT BREACHES

## METAL ROOF WORK

80.     SMM, by providing defective and deficient Metal Roof Work for the Project in a negligent manner, breached its Metal Roof Subcontract, including, but not limited to, the following:

### ARTICLE 2 SCOPE OF WORK

**2.2    SUBCONTRACT WORK** . . . Subcontractor shall perform the Subcontract Work under the general direction of Contractor and in accordance with the Subcontract Documents (**Exhibit 3**, attached hereto).

81.     SMM failed to comply with 2.2 of the Metal Roof Subcontract by not performing its Metal Roof Work in strict accordance with **<u>all</u>** shop drawings, plans and specifications, Subcontract Documents, Project contracts and/or addenda.

### ARTICLE 3 SUBCONTRACTOR'S RESPONSIBILITIES

**3.2    RESPONSIBILITIES** Subcontractor shall furnish its diligent efforts to perform the Subcontract Work in an *expeditious* manner and to cooperate with Contractor so that Contractor may fulfill its obligations to Owner.  Subcontractor shall furnish all of the labor, materials, equipment, and services, including, but not limited to, *competent supervision*, shop drawings, samples, tools, and scaffolding as are necessary for the proper performance of the Subcontract Work, all of which shall be provided in full accord with and reasonably inferable from the Subcontract Documents. Subcontractor shall provide Contractor a list of its proposed subcontractors and suppliers, and be responsible for taking field dimensions, providing tests, obtaining required permits related to the Subcontract Work and affidavits, ordering of materials and all other actions as required to meet the Progress Schedule (Emphasis added; **Exhibit 3**, attached hereto).

82.     SMM breached 3.2 of the Metal Roof Subcontract by failing to provide its Metal Roof Work in an a *prompt* and *efficient manner* and failing to

provide ***competent supervision*** to ensure that the work was being provided in a proper fashion with this scope of work contributing to the massive delays experienced with the Project.  The Project was on track to be completed on or before May 17, 2017, but as a result of the defects and deficiencies exacerbated by the negligently performed Metal Roof Work, the Project experienced a 30-month delay with substantial completion not being achieved until **November 18, 2019** and the Navy's final acceptance and "close-out" not occurring until **July 27, 2020**.

83.   SMM, by providing defective and deficient Metal Roof Work breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.3 INCONSISTENCIES AND OMISSIONS** Subcontractor shall examine and compare the drawings, specifications, other Subcontract Documents and information furnished by Owner relative to the Subcontract Work . . . Should Subcontractor discover any errors, inconsistencies, or omissions in the Subcontract Documents, Subcontractor shall promptly report such discoveries to Contractor in writing (**Exhibit 3**, attached hereto).

84.   SMM breached 3.3 of the Metal Roof Subcontract by failing to bring to WGI's attention any issues or discrepancies in the Project plans and specifications to the extent that SMM contends that the drawings or details as applied impacted its Metal Roof Work which was not provided in accordance with the shop drawings, plans and specifications, Subcontract Documents, Project contracts and/or addenda.

85.    SMM, by providing defective and deficient Metal Roof Work in a negligent manner, breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.10  COORDINATION** Subcontractor shall (a) cooperate with Contractor and all others whose work may interface with the Subcontract Work; (b) specifically note and immediately advise Contractor of any such interface with the Subcontract Work . . . (**Exhibit 3**, attached hereto).

86.    SMM breached 3.10 of the Metal Roof Subcontract by allowing its defective and deficient Metal Roof Work to interfere with and cause delays to the work performed by other trades without providing proper notice to WGI.

87.    SMM's ***workmanship*** in the performance of its Metal Roof Work being defective and deficient breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.13  GENERAL  WARRANTIES  ON  MATERIALS  AND EQUIPMENT** In addition to the warranties set forth in the Subcontract Documents, Subcontractor warrants that all materials and equipment shall be new unless otherwise specified, of good quality, in conformance with the Subcontract Documents, and free from defective ***workmanship*** and materials. . . Subcontractor further warrants that the Subcontract Work shall be free from material defects not intrinsic in the design or materials required in the Subcontract Documents (Emphasis added; **Exhibit 3**, attached hereto).

88.    SMM breached 3.13 of the Metal Roof Subcontract, *inter alia*, by providing connections from the trusses to the existing roof system that were inadequate (e.g. the screw pattern indicated in the shop drawings were not

followed); and connection brackets that were not shop primed as required by the specifications requiring removal and replacement after priming.

89.     SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

### 3.15 SAFETY

> **3.15.5** . . . Subcontractor shall use properly qualified individuals or entities to carry out the Subcontract Work in a safe and reasonable manner so as to reduce the risk of bodily injury or ***property damage*** (Emphasis added; **Exhibit 3**, attached hereto).

90.     SMM breached 3.15 of the Metal Roof Subcontract by using individuals whom were not qualified to perform the work in strict accordance with all shop drawings, plans and specifications, Subcontract Documents, Project contracts and/or addenda resulting in ***property damage*** necessitating removal and replacement of portions of SMM's Metal Roof Work (e.g. connection brackets).

91.     SMM, by providing defective and deficient Metal Roof Work in a negligent manner, breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.15.6** Damage or loss not insured under property insurance and to the extent caused by the negligent acts or omissions of Subcontractor, or anyone for whose acts Subcontractor may be liable, shall be promptly remedied by Subcontractor (**Exhibit 3**, attached hereto).

92.     SMM, despite being placed on notice of various defects and deficiencies with its Metal Roof Work, failed to timely remedy its negligent work which resulted in certain work having to be removed and replaced causing delays.

93.     SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.16 PROTECTION OF THE WORK** Subcontractor shall take necessary precautions to properly protect the Subcontract Work and the work of others from damage caused by Subcontractor's performance of the Subcontract Work.  Should Subcontractor cause damage to the Work or property of Owner, Contractor, or others, Subcontractor ***shall promptly remedy such damage to the satisfaction of Contractor***, or Contractor may, after forty-eight (48) hours' written notice to Subcontractor, remedy the damage and deduct its cost from any amounts due or to become due to Subcontractor, unless such costs are recovered under applicable property insurance (emphasis added; **Exhibit 3**, attached hereto).

94.     SMM breached 3.16 of the Metal Roof Subcontract by failing to ***promptly remedy*** its defective and deficient Metal Roof Work to the satisfaction of WGI after receiving notice of the various issues.

95.     SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

> **3.23.1 UNCOVERING OF SUBCONTRACT WORK**
>
> **3.23.1.1** If required in writing by Contractor, Subcontractor must uncover any portion of the Subcontract Work which has been covered by Subcontractor in violation of the Subcontract Documents or contrary to a directive issued to Subcontract by Contractor.  Upon receipt of a written directive from Contractor, Subcontractor shall uncover such work for Contractor's or Owner's inspection and restore

the uncovered Subcontract Work to its original condition at Subcontractor's time and expense (**Exhibit 3**, attached hereto).

96.     SMM breached 3.23.1.1 of the Metal Roof Subcontract by failing to uncover its defective work as directed by WGI in writing and to restore its uncovered work to its original condition at SMM's time and expense.

97.     SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

### 3.23.1 UNCOVERING OF SUBCONTRACT WORK

**3.23.1.2** Contractor may direct Subcontractor to uncover portions of the Subcontract Work for inspection by Owner or Contractor at any time.  Subcontractor is required to uncover such work whether or not Contractor or Owner had requested to inspect the Subcontract Work prior to it being covered.  Except as provided in the subsection immediately above, this Agreement shall be adjusted by Subcontract Change Order for the cost and time of uncovering and restoring any work which is uncovered for inspection and proves to be installed in accordance with the Subcontract Documents, provided Contractor had not previously instructed Subcontractor to leave the work uncovered. If Subcontractor uncovers work pursuant to a directive issued by Contractor, and such work upon inspection does not comply with the Subcontract Documents, Subcontractor shall be responsible for all costs and time of uncovering, correcting, and restoring the work so as to make it conform to the Subcontract Documents. . . (**Exhibit 3**, attached hereto).

98.     SMM breached 3.23.1.2 of the Metal Roof Subcontract by failing to take responsibility for all costs and time of uncovering, correcting, and restoring the defective and deficient Metal Roof Work to make it conform with the plans and specifications.

99.     SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

### 3.23.2 CORRECTION OF WORK

**3.23.2.1** If Owner or Contractor rejects the Subcontract Work or the Subcontract Work is not in conformance with the Subcontract Documents, Subcontractor shall promptly correct the Subcontract Work whether it had been fabricated, installed or completed. ***Subcontractor shall be responsible for the costs of correcting such Subcontract Work***, any required additional testing or inspections, and compensation for services and expenses of Owner and Contractor made necessary by the defective Subcontractor Work (emphasis added; **Exhibit 3**, attached hereto).

100.    SMM breached 3.23.2.1 of the Metal Roof Subcontract by failing to correct its work at its own expense which the Navy and WGI deemed to not be in conformance with the shop drawings, plans and specification, Subcontract Documents, Project contracts and/or addenda.

101.    SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

**3.23.2.2** In addition to Subcontractor's obligations under this section, Subcontractor agrees to ***promptly correct***, after receipt of a written notice from Contractor, all Subcontract Work performed under this Agreement which proves to be defective in workmanship or materials within a period of one year from the date of Substantial Completion of the Subcontract Work or for a longer period of time as may be required by specific warranties in the Subcontract Documents . . . If Subcontractor fails to correct defective or nonconforming Subcontract Work within a reasonable time after receipt of notice from Contractor, Contractor may correct such Subcontract Work pursuant to subsection 10.1.1. (Emphasis added; **Exhibit 3**, attached hereto).

102.   SMM breached 3.23.2.2 by failing to **_promptly correct_** its defective and deficient work and/or replace non-conforming work after receiving written notice from WGI.

103.   SMM, by providing defective and deficient Metal Roof Work, breached its Metal Roof Subcontract, including, but not limited to, the following:

### ARTICLE 5 PROGRESS SCHEDULE

**5.1 TIME IS OF THE ESSENCE** Time is of the essence for both Parties.   They mutually agree to see to the performance of their respective obligations so that the entire Project may be completed in accordance with the Subcontract Documents and particularly the Progress Schedule as set forth in Exhibit C. (**Exhibit 3**, attached hereto).

104.   SMM breached 5.1 of the Metal Roof Subcontract as a result of its defective and deficient Metal Roof Work which contributed to the 30-month Project delay.

### <u>WGI'S DAMAGES RELATED TO SMM</u>

105.   WGI suffered significant damages as a result of SMM's acts and omissions, which includes the defective, deficient, and negligent Steel Erection and Metal Roof Work performed by SMM for the Project.

106.   WGI's damages are the direct and proximate result of SMM's defective, deficient, and negligent Steel Erection Work (which caused damage to adjacent non-defective work already in place performed by other contractors) which WGI was required by the Navy to correct and remediate.

107.   WGI's damages related to SMM's Steel Erection Work are broken down into three general categories which include: (1) Vendor costs; (2) WGI Replacement/Remedial Contractors; and (3) Miscellaneous out of pocket costs, including delay costs, and exposure.

108.   WGI's damages related to SMM's Steel Erection Work are no less than **$12,000,000.00** and are continuing being far in excess of the $204,000.00 Steel Erection Bond limit.

109.   WGI has also incurred damages in excess of **$25,000.00** relating to the deficient and defective Metal Roof Work that SMM negligently provided for the Project.

110.   WGI also experienced delay, extended general conditions, increased warranty obligations to the Navy, and attorneys' fees and expenses as a direct and proximate result of the defective, deficient, and negligent Steel Erection and Metal Roof Work that SMM provided for the Project.

## **WGI'S FAILED MEDIATIONS AND ARBITRATION PROCEEDINGS FILED AGAINST SMM**

111.   WGI attempted through direct discussions to resolve its disputes with SMM regarding the defective, deficient, and negligent Steel Erection and Metal Roof Work that SMM provided to WGI for the Project as required by both the Steel Erection and Metal Roof Subcontracts (Paragraph 11.3.1).

112.   After direction discussions failed, on September 16, 2019, WGI, in compliance with the Steel Erection Subcontract (Paragraph 11.3.2), engaged in mediation with SMM and other parties before an American Arbitration Association ("AAA") mediator which did not result in settlement.

113.   On November 11, 2019, WGI filed a Demand for Arbitration with the AAA against SMM and other parties ("Arbitration Proceeding") as required by the Steel Erection and Metal Roof Subcontracts (Paragraph 11.3.3).

114.   On November 19, 2019, WGI stayed the Arbitration Proceeding to allow the parties to engage in a second mediation of this matter which took place on June 22, 2020 and also did not result in a settlement.

115.   On August 6, 2020, WGI reactivated the Arbitration Proceeding given the two failed mediation attempts.

116.   WGI, in the Arbitration Proceeding, has alleged claims against SMM for breach of contract; negligent construction; and general negligence regarding the Steel Erection Work that SMM provided for the Project.

117.   On August 19, 2020, SMM, in responding to WGI's Demand for Arbitration asserted a Counterclaim against WGI for breach of the Steel Erection and Metal Roof Subcontracts.

118.   On September 2, 2020, WGI filed its Affirmative Defenses and Answer to SMM's Counterclaim and will be amending its Demand for Arbitration

to include claims related to the Metal Roof Work that SMM's provided for the Project given that SMM has **now** made this an issue in the Arbitration Proceeding (despite not having done so during either of the mediations) with SMM performing this work at the same time as attempting to address the issues with its Steel Erection Work.

<u>COUNT I</u>
<u>CLAIM ON STEEL ERECTION BOND</u>

119.   WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 11, 14, 16 through 72, 105 through 108, and 110 through 118 of this Complaint and reiterates all of those allegations.

120.   Developers, as Surety, and SMM, as Principal, issued the Steel Erection Bond covering SMM's Steel Erection Work for the Project providing that "Principal has by written agreement dated <u>January 13, 2015</u> entered into a subcontract with Obligee for <u>Steel Erection, Bachelor's Quarters Repair 3709 and 3710, NAS, Pensacola, FL #N69450-15-C-0601 Job #1501</u> . . . NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if Principal shall ***promptly and faithfully*** perform said subcontract, then this obligation shall be ***null and void***; otherwise it shall remain in full force and effect" (Emphasis added; **Exhibit 2**, attached hereto).

121.   SMM did *not* promptly and faithfully perform its Steel Erection Subcontract therefore, Developers' obligation under the Steel Erection Bond did *not* become null and void but instead, remains in full force and effect.

122.   WGI provided various notices of default and deficiencies to SMM and Developers regarding SMM's defective, deficient, and negligent Steel Erection Work provided for the Project which also caused damage to adjacent non-defective work already in place performed by other trades.

123.   SMM was in default of its Steel Erection Subcontract and WGI declared SMM to be in default of its Steel Erection Subcontract.

124.   SMM was unable to correct the vast majority of the defective, deficient, and negligent Steel Erection Work that it provided for the Project.

125.   The Steel Erection Subcontract contains various provisions and terms under **ARTICLE 8 PAYMENT**, specifically **8.3 FINAL PAYMENT**, related to WGI and the Navy having to accept SMM's Steel Erection Work before *final* payment becomes due.

126.   Given SMM's defective, deficient, and negligent Steel Erection Work, final payment did not *arguably* become due until after substantial completion was achieved on **November 18, 2019** and/or the Project was finally accepted and closed-out by the Navy on **July 27, 2020**.

127.   WGI performed its obligations under SMM's Steel Erection Subcontract.

128.   Developers, despite being provided with notice of SMM's default of the Steel Erection Subcontract and the defective, deficient, and negligent Steel Erection Work that SMM provided to the Project, did not "promptly remedy the default" under the provisions of the Bond.

129.   WGI, after providing reasonable notice to Developers of SMM's default of the Steel Erection Subcontract and the defective, deficient, and negligent Steel Erection Work that SMM provided for the Project, WGI arranged for the performance of SMM's obligations under the Steel Erection Subcontract.

130.   WGI completed SMM's Steel Erection Subcontract and remedied/corrected SMM's defective, deficient, and negligent Steel Erection Work provided for the Project which also caused damage to adjacent non-defective work performed by other trades.

131.   WGI's reasonable cost to complete SMM's Steel Erection Subcontract and remedy/correct SMM's defective, deficient, and negligent Steel Erection Work provided for the Project exceeds the "balance of the [Steel Erection Subcontract] price" as defined by the Bond with Developers being required to pay WGI such excess not to exceed $204,000.00.

132.   WGI is a claimant entitled to protection as an Obligee under the terms of the Steel Erection Bond issued for the Project.

133.   SMM and Developers are jointly and severally liable to WGI pursuant to the terms of the Steel Erection Bond for the principal amount of $204,000.00.

134.   Given that WGI has initiated arbitration against SMM as required by the Steel Erection Subcontract, WGI is agreeable to staying this action if Developers will voluntarily join the Arbitration Proceeding regarding the Steel Erection Work that SMM provided for the Project.

135.   WGI has performed all conditions precedent to recover from SMM and Developers the principal amount of $204,000.00 under the Bond.

**WHEREFORE**, WGI respectfully requests that the Court enter judgment in favor of WGI and against Developers pursuant to the Steel Erection Bond for the following amounts:

(a)   the principal amount of $204,000.00; plus

(b)   all costs of this action; plus

(c)   such other and further relief as this Court deems just and proper.

### COUNT II
### CLAIM FOR BREACH OF CONTRACT
### STEEL ERECTION BOND

136.   WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 11, 14, 16 through 72, 105 through 108, and 110 through 135 of this Complaint and reiterates all of those allegations.

137.   The Steel Erection Bond issued by Developers for the benefit of WGI regarding the Steel Erection Work that SMM provided for the Project under its Steel Erection Subcontract is a valid and enforceable contract.

138.   WGI notified Developers of SMM's default under the Steel Erection Subcontract regarding the defective, deficient, and negligent Steel Erection Work that SMM provided for the Project.

139.   Developers requested additional documentation from WGI regarding SMM's default of the Steel Erection Subcontract which WGI provided.

140.   Developers, despite receiving notice of SMM's default and WGI's declaration of default of SMM's Steel Erection Subcontract, did not "promptly remedy the default" by arranging "performance" or pay WGI the "reasonable cost" in excessive of the subcontract price as required by the Steel Erection Bond for completing/remedying SMM's Steel Erection Subcontract.

141.   Developers' failure to arrange "performance" of SMM's Steel Erection Subcontract or pay WGI the "reasonable cost" in excess of the subcontract price after receiving notice of SMM's default and WGI's declaration

of default of SMM's Steel Erection Subcontract is a material breach of the Steel Erection Bond or contract.

142.   WGI has suffered damages as a result of Developers' breach of the Steel Erection Bond/contract in an amount in excess of the Bond limits of $204,000.00.

143.   Given that WGI has initiated arbitration against SMM as required by the Steel Erection Subcontract, WGI is agreeable to staying this action if Developers will voluntarily join the Arbitration Proceeding.

144.   WGI has performed all conditions precedent to recover from SMM and Developers for the principal amount of $204,000.00 under the Steel Erection Bond.

**WHEREFORE**, WGI respectfully requests that the Court enter judgment in favor of WGI and against Developers for breach of Steel Erection Bond or contract for the following amounts:

(a)   the principal amount of $204,000.00; plus

(b)   all costs of this action; plus

(c)   such other and further relief as this Court deems just and proper.

## COUNT III
## CLAIM ON METAL ROOF BOND

145.   WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 9, 12 through 13, 15 through 20, 73 through 105, and 109 through 118 of this Complaint and reiterates all of those allegations.

146.   Developers, as Surety, and SMM, as Principal, issued the Metal Roof Bond covering SMM's Metal Roof Work for the Project providing that "Principal has by written agreement dated <u>January 13, 2015</u> entered into a subcontract with Obligee for <u>Standing Seam Metal Roof, Bachelor's Quarters Repair 3709 and 3710, NAS, Pensacola, FL #N69450-15-C-0601 Job #1501</u>. . . NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if Principal shall ***promptly and faithfully*** perform said subcontract, then this obligation shall be ***null and void***; otherwise it shall remain in full force and effect." (Emphasis added; **Exhibit 4**, attached hereto).

147.   SMM did ***not*** promptly and faithfully perform its Metal Roof Subcontract therefore, Developers' obligation under the Bond did ***not*** become null and void but instead, remains in full force and effect.

148.   WGI provided various notices of default and deficiencies to SMM and Developers regarding SMM's defective, deficient, and negligent work which included the Metal Roof Work that SMM provided for the Project.

149.   SMM was in default of its Metal Roof Work and WGI declared SMM to be in default of its Metal Roof Subcontract.

150.   SMM was attempting to correct its defective, deficient, and negligent Steel Erection Work during the same time it was performing Metal Roof Work for the Project.

151.   The Metal Roof Subcontract contains various provisions and terms under **ARTICLE 8 PAYMENT**, specifically **8.3 FINAL PAYMENT**, related to WGI and the Navy having to accept SMM's Metal Roof Work before ***final*** payment becomes due.

152.   Given SMM's defective, deficient, and negligent Metal Roof Work, final payment did not ***arguably*** become due until after substantial completion was achieved on **November 18, 2019** and/or the Project was finally accepted and closed-out by the Navy on **July 27, 2020**.

153.   WGI performed its obligations under SMM's Metal Roof Subcontract.

154.   Developers, despite being provided with notice of SMM's default of the Metal Roof Subcontract and the defective, deficient, and negligent Metal Roof Work that SMM provided to the Project, did not "promptly remedy the default" under the provisions of the Bond.

155.   WGI, after providing reasonable notice to Developers of SMM's default of the Metal Roof Subcontract and the defective, deficient, and negligent Metal Roof Work provided for the Project, WGI arranged for the performance of SMM's obligations under the Metal Roof Subcontract.

156.   WGI arranged for the completion of SMM's Metal Roof Subcontract and the remediation and correction of SMM's defective, deficient, and negligent Metal Roof Work provided for the Project.

157.   WGI's reasonable cost to assist with the completion of SMM's Metal Roof Subcontract and remedy/correct SMM's defective, deficient, and negligent Metal Roof Work provided for the Project exceeds the "balance of the [Metal Roof Subcontract] price" as defined by the Bond with Developers being required to pay WGI such excess not to exceed $362,100.00.

158.   WGI is a claimant entitled to protection as an Obligee under the terms of the Metal Roof Bond issued for the Project.

159.   SMM and Developers are jointly and severally liable to WGI pursuant to the terms of the Metal Roof Bond for the principal amount of at least $25,000.00.

160.   Given that WGI has initiated arbitration against SMM as required by the Metal Roof Subcontract, WGI is agreeable to staying this action if Developers will voluntarily join the Arbitration Proceeding regarding the Metal Roof Work that SMM provided for the Project.

161.   WGI has performed all conditions precedent to recover from SMM and Developers the principal amount of at least $25,000.00 under the Metal Roof Bond.

**WHEREFORE**, WGI respectfully requests that the Court enter judgment in favor of WGI and against Developers pursuant to the Metal Roof Bond for the following amounts:

(a)     the principal amount of at least $25,000.00; plus

(b)     all costs of this action; plus

(c)     such other and further relief as this Court deems just and proper.

<u>**COUNT IV**</u>
<u>**CLAIM FOR BREACH OF CONTRACT**</u>
<u>**METAL ROOF BOND**</u>

162.   WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 9, 12 through 13, 15 through 20, 73 through 105, 109 through 118, and 145 through 161 of this Complaint and reiterates all of those allegations.

163.   The Metal Roof Bond issued by Developers for the benefit of WGI regarding the Metal Roof Work that SMM provided for the Project under its Metal Roof Subcontract is a valid and enforceable contract.

164.   WGI notified Developers of SMM's default under the Metal Roof Subcontract regarding the defective, deficient, and negligent Metal Roof Work that SMM provided for the Project.

165.   Developers, despite receiving notice of SMM's default and WGI's declaration of default of SMM's Metal Roof Subcontract, did not "promptly

remedy the default" by arranging "performance" or pay WGI the "reasonable cost" in excessive of the subcontract price as required by the Metal Roof Bond for completing/remedying SMM's Metal Roof Subcontract.

166.   Developers' failure to arrange "performance" of SMM's Metal Roof Subcontract or pay WGI the "reasonable cost" in excess of the subcontract price after receiving notice of SMM's default and WGI's declaration of default of SMM's Metal Roof Subcontract is a material breach of the Metal Roof Bond or contract.

167.   WGI has suffered damages as a result of Developers' breach of the Metal Roof Bond/contract in an amount that is within in the Metal Roof Bond limits of $362,100.00.

168.   Given that WGI has initiated arbitration against SMM as required by the Metal Roof Subcontract, WGI is agreeable to staying this action if Developers will voluntarily join the Arbitration Proceeding.

169.   WGI has performed all conditions precedent to recover from SMM and Developers for the principal amount of at least $25,000.00 under the Metal Roof Bond/contract.

**WHEREFORE**, WGI respectfully requests that the Court enter judgment in favor of WGI and against Developers for breach of the Metal Roof Bond or contract for the following amounts:

(a)    the principal amount of at least $25,000.00; plus

(b)    all costs of this action; plus

(c)    such other and further relief as this Court deems just and proper.

Respectfully submitted,

**EMMANUEL SHEPPARD & CONDON**

*/s/ H. Wesley Reeder*

H. Wesley Reeder
Florida Bar Number: 195571
30 South Spring Street
Pensacola, Florida 32502
Telephone: (850) 433-6581
Primary:  hwr@esclaw.com
Secondary: nmb@esclaw.com;
sgoldsby@esclaw.com
***Attorney for Plaintiff Whitesell-Green, Inc.***